**FIFTH DIVISION
DILLARD, P. J.,
PETERSON and REESE, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**December 20, 2016**

# In the Court of Appeals of Georgia

A16A2072. WESTBROOK et al. v. ATLANTA GAS LIGHT COMPANY.

PETERSON, Judge.

Kevin Westbrook and Shaunda Gould brought this lawsuit against Atlanta Gas Light Company ("AGL") over a residential natural gas explosion that physically injured the plaintiffs. The plaintiffs appeal the trial court's grant of summary judgment to AGL, arguing that the trial court erred by finding that AGL's actions involving a pre-explosion service call did not proximately cause their injuries and that a warning provided by AGL was adequate as a matter of law. With the benefit of oral argument, we find that the trial court did not err in granting summary judgment for those reasons.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56(c). We review a grant or denial of summary judgment de novo and construe the evidence in the light most favorable to the nonmovant. *Home Builders Ass'n of Savannah v. Chatham Cty.*, 276 Ga. 243, 245 (1) (577 SE2d 564) (2003).

So viewed, this case stems from an explosion that occurred on November 4, 2010, at a detached apartment on residential property owned by Herschel Thomas. Some time prior to the accident, Thomas had arranged for the natural gas to both the apartment and the main house (in which he lived with his family) to be turned off, because the outbuilding was vacant and gas was not being used in the main house. Thomas subsequently agreed to rent the outbuilding to Westbrook, a co-worker.

In anticipation of Westbrook living in the apartment, Thomas requested (via a natural gas marking company) that AGL turn the gas back on. An AGL field representative, Kenny Newell, visited the home on October 22, 2010. Thomas was not at home at the time. Tiffany "Buffy" Northcutt, the 20-year-old girlfriend of Thomas' stepson, Vincent Gardner, was at the house to meet the AGL representative. Gardner informed Northcutt that the AGL representative was coming, based on a conversation with his stepfather. Although Thomas testified that Northcutt was not his "agent,"

2

Northcutt testified that meeting the AGL representative was her reason for being at the house:

> Q. Did you give [a warning card left by the AGL representative] to Mr. Thomas at some point?
>
> A. I can't recall but he wasn't home so I might have left it there and left the house. We didn't stay all day. We just were there for the gas guy so we might have left after he left.
>
> Q. Mr. Gardner gave you — Mr. Gardner was living at the house; is that correct?
>
> A. Yes.
>
> Q. And he gave you permission to remain there at the house and let the gas man in when he came?
>
> A. Yes.
>
> Q. And as far as you know, was that acceptable to Mr. Thomas as well?
>
> A. Yes, as far as I know.

3

After being let into the house, Newell found a note in the kitchen asking him to check the gas line behind the electric range to see if it needed to be capped. He capped the line behind the stove and inspected a furnace in the attic. He subsequently examined the gas meter, unlocked it, and turned the gas on. The meter showed there was a leak in the fuel line or an open line so he turned the gas back off. After confirming that "everything was off" in the house, Newell turned the gas back on and let it run for a few seconds before going into the house again and determining that he "didn't smell anything inside." Newell deposed that, rather than take further steps to determine the location of the leak, he "left the meter off in a safe and secure position where no gas would escape unless it was physically turned on by someone." He did not, however, replace the lock that he previously had removed from the meter. Newell deposed that, at the time he made his service call, he was not aware of the existence of the apartment behind the house.

Newell filled out a warning card before he left. The top of the card read: "DANGER. This meter or appliance must not be turned on until the condition(s) indicated below have been corrected." Below that warning, an X indicated that there was a "[l]eak in house piping[.]" Newell also handwrote, "Leak in fuel line. Left meter off but unlocked for plumber." Newell marked with an X a line that said, "Have

the qualified agency/person connect and/or activate the appliance." An affirmation on the same card, which was signed by Northcutt, read:

> I have been duly notified of the condition of the foregoing equipment and I will not use nor permit its use by any person until the listed condition(s) is corrected. I further understand that I must ensure that only a qualified agency or person performs the repairs. A person not experienced and qualified in this type work is not allowed to perform the repairs or turn the gas on.

Newell left one copy of the card with Northcutt. Consistent with a checked entry on the card, Newell testified that he left another copy of the card on the meter. In his deposition, however, Thomas disputed whether Newell really left a card on the meter.

Newell deposed that he explained the situation to both Northcutt and Gardner, telling them that there was a leak in the fuel line, that he was leaving the meter off, and that a plumber was needed. Northcutt deposed that she did not recall having such a conversation with the AGL representative:

> Q.     Is it fair to assume that no employee from Atlanta Gas Light told you a dangerous condition existed?
>
> [Objection.]

A. I don't recall. I don't know whether — I don't remember a conversation but I don't recall, but as far as you asking me like would I remember if someone told me that a house could catch on fire, I think I would remember that but I don't recall the conversation.

Gardner testified that, in fact, he was not home when Newell came by, but had gone out to pick up some food.

Northcutt told Thomas that the AGL employee told her that Thomas needed to arrange for someone else to come to the house to turn on the gas. Northcutt did not tell Thomas that the AGL employee could not turn the gas on because there was a leak in the line. Northcutt deposed that she did not recall whether she gave Thomas the copy of the card the AGL representative left with her, saying she might have left the card at the house when she left, but Thomas testified that he saw it. Specifically, Thomas testified as follows:

Q. Did you go over this or did you read it when Tiffany gave it to you?

A. Basically.

Q. You read it?

A. Gazed over it.

Q.      Did you ever tell Tiffany that she didn't have your permission to sign that document at the bottom?

A.      Did I tell her she didn't?

Q.      Yes, sir.

A.      No, I didn't tell her that.

Q.      And at the top of that exhibit, or the card, what's that word right there?

A.      Danger.

Q.      Do you need anybody to explain to you what danger means?

[Objection.]

[A.]    Pretty much not.

Q.      You don't need anybody to tell you what that means, do you?

A.      Huh-uh.

Q.      No? And under [line] 11, can you read that handwritten note there?

7

A.     "Leak, fuel left off but unlocked for plumber."

Q.     It says "leak in fuel line, left meter off but unlocked for plumber." Is that correct?

A.     Uh-huh.

Q.     Is that right?

A.     Yes.

Q.     And you read that at the time that Tiffany gave it to you?

A.     I think I glazed over that.

Q.     And she gave you that on or about October 22nd when she signed for it?

A.     Yeah, let's go with that.

Q.     And at the bottom it gives you a phone number to call for assistance with repairs, correct?

A.     Yeah, I see it.

Q.     Did you ever call anyone from AGL once you saw this document?

8

[Objection.]

[A.]   No.

Q.   Did you ever call up AGL to find out what this document meant?

A.   No.

Q.   Did you ever advise Atlanta Gas Light that you didn't understand what this document —

A.   Didn't nobody ask me.

Q.   But you never picked up the phone and called AGL and said what is —

A.   AGL didn't call me and ask me either. I didn't call them. They didn't call me.

Q.   But they left this document at your house?

A.   They left that.

Q.   And Tiffany gave it to you?

A.   Yeah. They left it with Buffy.

Thomas deposed that he did not understand the card to mean that he had a leak in his gas system. Thomas understood "that the meter had been left off and that a plumber was supposed to come and do whatever needed to be done before the gas was turned on" and that "everything was good."

Thomas asked a friend named John, who had performed odd jobs for him in the past, to turn the gas on. Thomas was not home when John came to perform the work, but Thomas understood that John "turned [the gas] on." Thomas testified that he did not know the extent of John's background in plumbing, but doubted John was trained as a plumber.

On the morning of November 4, 2010, Westbrook visited the apartment to move in some of his personal belongings. Westbrook was accompanied by Gould, an acquaintance. Westbrook unloaded items from his vehicle and placed them in the apartment, making several trips between the vehicle and the apartment. Westbrook did not smell anything unusual in the apartment, although he noted that it smelled "old" as was the case during his earlier visits. As Westbrook prepared to leave, he ignited a lighter to light some incense while standing by the open door of the apartment, to get rid of the "old" smell. As soon as Westbrook ignited his lighter, there was an explosion that set the apartment on fire. Westbrook was hospitalized for

burns on his hands and face. Gould, who was further into the house behind Westbrook when he ignited his lighter, also was injured. A fire department investigation determined that an open natural gas line was the source of the explosion.

On September 27, 2010, a few weeks before Newell visited Thomas' property, AGL's corporate superintendent decreed via e-mail that anytime an AGL representative turns off an AGL-owned gas meter valve, "it needs to be locked." Newell was trained on this new policy, and multiple AGL witnesses testified that Newell violated it when he serviced Thomas' home.

Westbrook and Gould brought suit against AGL, alleging that AGL's negligence caused their injuries. The plaintiffs alleged that AGL was negligent in identifying and eliminating a leak in the gas line or failing to close an open line, including by locking the gas meter in the off position. They also alleged that AGL was negligent in failing to train its service representatives and in failing to sufficiently warn them or Thomas about the dangerous nature of the gas leak. AGL moved for summary judgment. The trial court granted AGL's motion, concluding that the intervening actions of Northcutt, Thomas, and Thomas' handyman broke the causal connection between any negligence by AGL in failing to lock the meter (or

11

train its representative to do so) and the plaintiffs' injuries. The trial court also rejected the plaintiffs' failure to warn claim on the basis that the warning card provided by AGL was adequate. The plaintiffs filed this appeal, arguing that the trial court erred in granting summary judgment, specifically by finding that the plaintiffs' injuries were not proximately caused by AGL and by finding that the warning provided was adequate as a matter of law.

1. The plaintiffs first argue that the trial court erred by finding that their injuries were not proximately caused by the AGL representative's failure to lock the meter or AGL's failure to train him to do so. The trial court did not err.

Negligence is actionable only if it is the proximate cause of the injuries sued upon. *Granger v. MST Transp., LLC*, 329 Ga. App. 268, 270 (1) (764 SE2d 872) (2014). This requirement reflects a policy decision that in certain circumstances — i.e., where there is an intervening act — the defendant's conduct and the plaintiff's injury are too remote for the law to allow recovery. *Jim Tidwell Ford, Inc. v. Bashuk*, 335 Ga. App. 668, 670 (1) (782 SE2d 721) (2016). "[T]he general rule is that if, subsequently to an original wrongful act, a new cause has intervened, of itself sufficient to stand as the cause of the misfortune, the former must be considered as too remote[.]" *Ontario Sewing Mach. Co. v. Smith*, 275 Ga. 683, 686 (2) (572 SE2d

533) (2002) (citation and punctuation omitted). But the causal connection is not broken, and the original wrongdoer may be held responsible, if the intervening act "was such that its probable or natural consequences could reasonably have been anticipated, apprehended, or foreseen by" the original wrongdoer. *Id.* Although the question of proximate cause is usually one for a jury, it may be decided as a matter of law when the jury could conclude only that the defendant's acts were not the proximate cause of the injury. *Atlanta Gas Light Co. v. Gresham*, 260 Ga. 391, 393 (4) (394 SE2d 345) (1990); *Beasley v. A Better Gas Co.*, 269 Ga. App. 426, 427-28 (1) (604 SE2d 202) (2004).

In concluding that the plaintiff had failed to point to evidence of proximate cause sufficient to create a jury issue, the trial court relied heavily on our decision in *Stegall v. Cent. Ga. Elec. Membership Corp.*, 221 Ga. App. 187 (470 SE2d 782) (1996). In that case, the plaintiffs, tenants in a mobile home, contacted the electric membership corporation ("EMC") servicing the home after noticing they were receiving "tingling" electric shocks when, for example, they simultaneously touched two pieces of metal in or on the mobile home. *Stegall*, 221 Ga. App. at 187. An EMC service technician tested several areas inside the home and determined that the home contained potentially life-threatening voltage levels, but discovered that the voltage

13

reading registered zero when he shut off one particular circuit breaker. *Id.* The technician personally informed one of the plaintiffs that the situation was dangerous — even noting that a friend had been killed by that same level of voltage — and advised her not to turn the circuit breaker back on until someone had checked and repaired it. *Id.* at 188. The plaintiffs' landlord and another man subsequently changed the receptacles on the identified circuit, but one of the plaintiffs testified that within a day or two of that work she again received electrical shocks from touching objects on the premises. *Id.* at 189. She testified that she kept the circuit on, per her landlord's assurances, for two months, until her six-year-old child was fatally electrocuted. *Id.* at 187, 189. Affirming summary judgment for the EMC, we found as a matter of law that the EMC's actions were not the proximate cause of the child's death. *Id.* at 190-91 (2). We concluded that the acts and statements of third parties that resulted in the breaker being turned on constituted an intervening act that was not foreseeable by the EMC, particularly in the light of the detailed warning that the technician had provided the plaintiff. *Id.* at 191 (2).

We agree with the trial court that, as in *Stegall*, this is a case in which the jury could conclude only that no action of AGL proximately caused the plaintiffs'

14

injuries.[1] Even assuming that the AGL representative's failure to reinstall a lock on the gas meter was a but-for cause of the explosion,[2] it is plain that the subsequent actions of Thomas, assisted by his handyman, to turn on the gas without fixing the leak was a "new cause . . . sufficient to stand as the cause of" the explosion. *Ontario Sewing Mach. Co.*, 275 Ga. at 686 (2). A jury could not conclude that AGL reasonably could have foreseen that Thomas would have taken that action in derogation of the clear written warning left by the AGL representative specifying that

---

[1] AGL argues that the trial court's order must be affirmed because the plaintiff made no attempt to distinguish *Stegall* in their brief responding to AGL's summary judgment motion and did not designate the transcript of the hearing on the motion as something to be included in the record on appeal. But any failure to address *Stegall* in responding to AGL's summary judgment motion is not fatal to the plaintiffs' appeal. *See Hall v. Massally*, 329 Ga. App. 136, 138 (1) (764 SE2d 161) (2014) ("The failure of a nonmoving party to file responsive material . . . does not automatically entitle the moving party to judgment, for there is no such thing as a 'default summary judgment.' To affirm a grant of summary judgment, it must affirmatively appear from the record that no question of material fact exists and the moving party is entitled to judgment as a matter of law.") (citations and punctuation omitted). We have an obligation to apply the law faithfully, regardless of what specific arguments about the case law the parties made below, and we appreciate the parties' efforts on appeal to assist us in that task.

[2] The service representative testified that a lock would not make the meter more secure because the lock could be broken off with a wrench. But we recognize that the presence of a lock might have signaled Thomas' handyman to reconsider his actions as he proceeded to turn the gas back on.

Thomas' natural gas system had a dangerous leak that needed to be corrected before the gas could be turned on.

Faced with the obvious similarities between *Stegall* and this case, the plaintiffs spend considerable effort on appeal attempting to distinguish the two. They argue that while the EMC service technician made a dangerous condition more safe by turning off the circuit breaker, the AGL representative made the gas system on Thomas' property less safe by failing to replace the lock that had been present on the meter valve, thereby creating a dangerous condition of which the explosion and their serious injuries were a foreseeable result. The plaintiffs also argue that the cases are distinguishable because AGL was under a federal regulatory mandate to lock the meter valve, while EMC was under no federally-imposed duty to lock the circuit breaker.[3] Regardless of whether AGL's characterization of the applicable federal

---

[3] The plaintiffs cite 49 CFR § 192.727(d), which requires that:

Whenever service to a customer is discontinued, one of the following must be complied with:

(1) The valve that is closed to prevent the flow of gas to the customer must be provided with a locking device or other means designed to prevent the opening of the value by persons other than those authorized by the operator[;]

regulatory frameworks is correct, both of these distinctions speak to the extent of AGL's negligence, not whether that negligence has a sufficient causal connection to the plaintiffs' injuries to permit recovery. Evidence of a statutory violation constituting negligence per se does not obviate the need to prove that this negligence proximately caused a plaintiff's injury. *See Howard v. Gourmet Concepts Int'l*, 242 Ga. App. 521, 523-24 (1) (c) (529 SE2d 406) (2000).

The plaintiffs also attempt to distinguish *Stegall* on the basis that the service representative in that case personally delivered a warning to the customer that was more detailed than the warning provided by the AGL representative. But we see no pertinent distinction between the content of the warnings given in the two cases. Although there was evidence that the EMC technician warned the *Stegall* plaintiff of a potentially deadly hazard, this is not remarkably different from the warning card provided to Thomas, which began with the warning of "DANGER" and twice noted a gas leak. As we have noted in a different context, "it is common knowledge that the

---

(2) A mechanical device or fitting that will prevent the flow of gas must be installed in the service line or in the meter assembly[; or]

(3) The customer's piping must be physically disconnected from the gas supply and the open pipe ends sealed.

17

escape of inflammable gas under high pressure is dangerous[.]" *Armor Gas Corp. v. Davis*, 93 Ga. App. 563, 565 (2) (92 SE2d 244) (1956).

As for the plaintiffs' argument that *Stegall* is distinguishable because here the AGL representative did not personally deliver a warning to Thomas, we note the undisputed evidence shows that Newell explained to Northcutt, who was waiting at Thomas' house for the express purpose of meeting the AGL representative in Thomas' absence, that there was a leak in the fuel line and a plumber was needed. Although Northcutt testified that she did not recall such a conversation, this is insufficient to create a genuine dispute of fact as to whether the conversation occurred given the direct evidence in the form of Newell's testimony that it did. *See Perdue v. Atlanta Bldg. Maint. Co.*, 311 Ga. App. 81, 84-85 (2) (714 SE2d 611) (2011) (plaintiff's testimony that she could not recall a warning being made over school intercom cannot create issue of fact in the face of direct evidence that the warning was in fact given). But even setting that conversation aside, we see no reason to disregard *Stegall* based on the fact that the plaintiff in *Stegall* received an oral warning and Thomas received a warning on a card that was hand-delivered to the person he arranged (via his stepson) to meet the AGL representative. There is no dispute that Thomas received and read the card. The plaintiffs offer no basis for their

18

argument that an oral warning would have been a superior means of communication, and Thomas' testimony that he would have followed "explicit instructions" if the AGL representative "had sat [him] down and explained . . . what the issues were" is mere speculation. Indeed, a written warning may prevent the loss of information in translation (as shown by the affidavit testimony of the plaintiff in *Stegall*, who said that she did not understand that the friend referenced by the EMC technician had been killed under conditions similar to those in her home or that the voltage level referenced by the technician "had anything to do with our trailer"). *Stegall*, 221 Ga. App. at 189.

Finally, the plaintiffs attempt to distinguish *Stegall* on the basis that in that case the mobile home's electrical system "was substantially altered" between the day that the EMC technician visited the home and the day the plaintiffs' child was electrocuted, whereas in this case there is no evidence that Thomas' handyman attempted to fix the problem. But this is a distinction without a difference. In both cases, the premises were left in a condition that did not pose an immediate danger — the EMC technician turned off the circuit breaker, and the AGL representative turned off the gas (after having turned it on as requested). And in each case, a third party took an action — turning on the circuit breaker, or turning on the gas — that created

a dangerous condition. It does not matter that Thomas' handyman apparently did not try to fix the gas leak; although the *Stegall* plaintiffs' landlord attempted to fix the problem, the attempt obviously was unsuccessful.

The cases cited by the plaintiffs do not require a result different from that in *Stegall*. The plaintiffs rely on *Beasley*, in which we affirmed a denial of summary judgment to a propane gas company based on evidence that a company employee, when sealing a gas line in the plaintiff's bathroom, negligently left the line sticking four to five inches out of floor. 269 Ga. App. at 427-29 (1). The line was later damaged, leading to a gas leak that fueled a fire. *Id.* at 428 (1). The plaintiffs argue that if there was sufficient evidence of proximate causation in that case to avoid summary judgment, there is sufficient evidence here, as in both cases the natural and probable consequences of leaving the property the way the defendant did was that someone might take some action that could create the conditions necessary for an explosion. But *Beasley* does not apply here because there is no indication that in that case the propane gas company representative warned anyone that the protruding gas line was a hazard that needed to be remedied. In *Beasley*, we found that a jury could conclude that "the natural and probable consequence" of leaving a gas line exposed was that the gas line would be damaged. *Id.* at 429 (1). But, as explained above, it

was not a natural and probable consequence of the AGL representative leaving Thomas' gas meter unlocked that Thomas would allow someone to turn on the gas before repairing the leak, in contravention of the representative's written warning. Another case cited by the plaintiffs, *Atlanta Gas Light Co. v. Mills*, 78 Ga. App. 690 (51 SE2d 705) (1949), similarly lacks evidence of any kind of warning by the defendant. In that case, we allowed a plaintiff to proceed with his lawsuit on the theory that holes the defendant gas company cut into street pavement exacerbated his injuries in an automobile accident. *Id.* at 694-97 (1). *Mills* does not apply here because there it was alleged that the gas company used no lights, signs or barricades to warn motorists of the hazard, *id.* at 691-92, unlike here, where the defendant representative provided a specific warning card.

2. The plaintiffs also argue that the trial court erred by concluding that the warning AGL provided was adequate as a matter of law. We disagree.

After granting summary judgment to AGL on the plaintiffs' claims regarding the service representative's failure to lock the meter, based on the proximate cause analysis discussed above, the trial court stated that the plaintiffs' failure to warn claim "arguably survives this causation analysis[.]" The trial court then went on to conclude that AGL nonetheless was entitled to summary judgment on the failure to warn claim

21

because the warning provided was adequate as a matter of law. The plaintiffs' failure to warn claim encompasses multiple theories, including that the warning was insufficient in substance because the AGL representative did not communicate that turning on the gas could "could cause a catastrophic leak and explosion" and or that the gas could be ignited by so benign an act as flipping on a light switch. The plaintiffs also argue that the warning was not effectively communicated in that it was not placed on the meter and was not orally communicated to the homeowner himself. We will address the plaintiffs' two types of failure to warn theories separately.

Considering first the plaintiffs' complaint that the warning given was insufficient in substance, we agree with AGL that the written warning was substantively adequate as a matter of law. The warning informed Thomas that he had a leak in his gas system and that he should not turn the gas on until the leak was repaired by a qualified person. It warned that this condition posed a "DANGER[.]" The plaintiffs complain that it did not inform Thomas that a leak could cause an explosion. But "[t]he open and obvious nature of a danger obviates the duty to warn of that danger." *White v. Ga. Power Co.*, 265 Ga. App. 664, 666 (1) (595 SE2d 353) (2004) (power company did not have duty to warn of danger of drowning posed by deep, swiftly-moving river downstream from company's dam); *see also Royal v.*

22

*Ferrellgas, Inc.*, 254 Ga. App. 696, 705 (3) (a) (ii) (563 SE2d 451) (2002) (where all of the information the plaintiff alleges that the defendant propane gas company should have told her was known by her and her employer, the gas company's failure to warn could not be the proximate cause of her injury). The standard is not whether Thomas subjectively knew of the dangers of natural gas, but whether, objectively, a person of ordinary prudence would be aware of those dangers. *See Newill v. Atlanta Gas-Light Co.*, 48 Ga. App. 226, 231 (172 SE 232) (1933) ("Whether a person is negligent in using a lighted match in searching for a gas leak depends on whether he has notice that the gas is escaping in large quantities, or whether a man of ordinary prudence, placed in the same situation, would believe that there was danger of an explosion; and such a question is one for the determination of the jury.") A person of ordinary prudence knows about the dangers of natural gas because, as noted above, "it is common knowledge that the escape of inflammable gas under high pressure is dangerous[.]" *Armor Gas Corp.*, 93 Ga. App. at 565. Thus, assuming AGL had a duty to give Thomas any warning about the conditions on his property, it did not have a duty to warn him exactly why the leak posed a danger. To the extent the plaintiffs complain that the warning did not make explicit that an innocuous act such as flipping a light switch could ignite natural gas, this argument is unavailing given that

23

such an innocuous act was not the cause of their injuries. Rather, the explosion resulted from Westbrook's use of a lighter — which, as is common knowledge, could ignite a combustible gas.

The plaintiffs also complain that the communication of the warning was inadequate in that the written card was not placed on the meter and the AGL representative did not talk to Thomas directly. Regarding their complaint about the lack of oral communication, the plaintiffs point to AGL's Field Service Manual, which instructs AGL service representatives who encounter a leak while the customer is not home to make "an attempt to contact and inform the customer" if "time permits and circumstances warrant." However, this is not evidence that an oral warning would have been a means of communication superior to a written one, and the plaintiffs do not present any. Moreover, as explained above, the plaintiffs have not pointed to evidence disputing the AGL representative's testimony that he explained the situation to Northcutt, as Northcutt's testimony that she did not recall such a conversation was not sufficient to create a genuine issue of material fact on this point. We have said that there can be no breach of a duty to warn when a warning is was actually given but is not passed along to someone who needed to hear it. Specifically, in *Royal*, the plaintiff brought suit against a propane distributor for injuries she suffered in a fire

in the kitchen of her employer. 254 Ga. App. at 696. The plaintiff argued that the propane company had a duty to warn her about the dangers of propane. *Id.* at 704 (3) (a) (ii). Noting that the plaintiff's employer was provided safety booklets warning of these very dangers, and that the plaintiff testified to her knowledge of those dangers, we held that the trial court erred in denying summary judgment to the gas company. *Id.* at 705 (3) (a) (ii). In short, we said, "[t]here can be no breach of a duty to warn when the warning was actually given, but [the plaintiff]'s employer did not pass on the warning or [the plaintiff] herself failed to heed it." *Id.* Similarly, here, to the extent that Northcutt failed to relay accurately what the AGL representative told her, that cannot create liability for AGL on a failure to warn theory. Moreover, it is undisputed that Thomas read the warning provided on the card, so he was informed of the dangers the plaintiffs now complain that AGL failed to discuss with Thomas personally.

For this same reason, the plaintiffs cannot complain that AGL did not leave a duplicate card on the meter. This is not a case in which a plaintiff can say that a warning was inadequate because it was communicated in such a way that it would go unnoticed. *See, e.g., Rhodes v. Interstate Battery Sys. of Am., Inc.*, 722 F.2d 1517, 1519-20 (11th Cir. 1984) (reversing grant of summary judgment to defendant where

25

plaintiff complained that warning on battery that he failed to read was inadequate because he would not see it in poor lighting), *superseded by statute on other grounds as stated in Freeman v. United Cities Propane Gas of Ga., Inc.*, 807 F. Supp. 1533, 1539-40 (M.D. Ga. 1992). Rather, Thomas in fact did see the card warning him of the dangerous condition on his property. He simply did not heed that warning, and the explosion that injured the plaintiffs was the tragic result.

*Judgment affirmed. Reese, J. concurs. Dillard, P. J.concurs in Division 1 and concurs in judgment only in Division 2.*

A16A2072.  WESTBROOK, et al. v. ATLANTA  GAS  LIGHT
    COMPANY.


DILLARD, Presiding Judge, concurring in judgment only.

I concur fully in Division 1 of the majority's opinion. As to Division 2, I concur in judgment only because I do not agree with all that is said in that division of the opinion. As a result, Division 2 of the majority's opinion decides only the issues presented in that division and may not be cited as binding precedent. See Court of Appeals Rule 33 (a).